## LAFAYETTE L. DAVIS *v.* THOMAS JUDGE.

*Establishment of Boundary Line by Acquiescence. Practice.*

A line may be established by acquiescence of the parties, that is different from the true line; and where adjoining owners treat a line as the division line, and occupy with reference to it for a period of fifteen years, although it was not, in the first instance, established by them by agreement, it becomes the true line, as much as though it were established and evidenced by an original survey.

If error be committed against a party upon one point, but the jury find against the party by special verdict upon a separate and distinct point, the error is thereby cured.

EJECTMENT for land in the village of Brattleboro. Plea, the general issue, and trial by jury, September term, 1873, BARRETT, J., presiding.

The plaintiff, to maintain the issue on his part, gave in evidence a deed from Wm. Barnes to Wm. Pulsipher, dated February 3, 1827 ; copy of record of the probate of Wm. F. Pulsipher's will, August 15, 1838, devising the lands he owned in Brattleboro, to David Ball ; deed, E. B. Wales to John Simonds, August 6, 1850 ;

same to G. W. Esterbrook, same date ; Samuel Ball and others to
David Ball, September 26, 1851 ; David Ball to J. H. & W. H.
Esterbrook, April 1, 1853 ; John B. Simonds to J. H. & W. H.
Esterbrook, April 1, 1857 ; report of commissioners dividing
lands between J. H. & W. H. Esterbrook, April 13, 1863 ; W.
H. Esterbrook to the plaintiff, February 19, 1867 ; and to further
maintain the issue on his part, and to show that the defendant had
no title to the demanded premises, the plaintiff also gave in evi-
dence the following deeds in the defendant's chain of title : Henry
S. Rockey to John L. Dickerman, September 28, 1837 ; Dicker-
man to Alanson Stone, May 11, 1848 ; Stone and wife to Isaac
Hall, March 12, 1852 ; Hall and wife to the defendant, February
22, 1854.   The plaintiff offered no other evidence tending to show
that he or his grantors had title by deed to the land in controversy.

The defendant, to show title to the demanded premises in him-
self, introduced evidence tending to show that in 1801, one Joseph
Clark owned the land now owned by himself and the plaintiff,
and gave in evidence, to complete his chain of title, in addition to
the deeds introduced by the plaintiff, a deed from Joseph Clark to
James Elliott, dated July 1, 1801 ; Elliott to Noah Sabin, May
26, 1803 ; Sabin to David Stebbins, January 28, 1811 ; Stebbins
to Elihu Hotchkiss, April 2, 1811 ; Hotchkiss to Elihu H. Thomp-
son, May 15, 1830 ; Thompson to Henry S. Rockey, May 15,
1830 ; and to complete the plaintiff's chain of title, introduced a
deed from Joseph Clark to Levi Pratt, dated May 20, 1804, and
from Pratt, deduced the title through several *mesne* conveyances,
to Wm. Barnes, Jr., August 25, 1815.*

The evidence on both sides concurred in showing, that before
the recollection of any witness produced, there was on the plain-
tiff's lot, an old red house, which, until it was torn down by J.
H. & W. H. Esterbrook in 1854 or 1855, was principally occu-
pied as a tenement house.   The evidence on both sides also
showed, that before the recollection of any witness produced, the
old yellow house occupied by the defendant, was standing upon
his premises, and that in a line therewith, and extending westerly,
there was a long shed and other out-buildings.  It was not contro-

---

* None of the deeds in the case were furnished the reporter.

verted but that the house now standing upon the defendant's lot, was the same house mentioned in the deed from Joseph Clark to James Elliot as then in occupation of Benjamin Smead, and also in the deed from James Elliott to Noah Sabin, 3d, dated May 26, 1803 ; but there was no evidence, except what was found in the descriptions in the several deeds, tending to show which house was first erected. No witness upon either side professed to have any personal knowledge where the line mentioned in the old deeds between the premises owned by the plaintiff and the defendant was located ; but the plaintiff insisted that the line claimed by him as indicated on his plan, was the line. It was not claimed by either party, that any bound or monument mentioned in the deeds, could now be located, except the northeast corner of the defendant's house ; and as to that, the plaintiff claimed that the northeast corner was the corner which extended furthest east, being the corner of the main part of the house. The defendant claimed that it was at least doubtful whether the northeast corner referred to in the deed, might not be the corner of the ell part of the house, which stood twenty-four feet westerly of the main part, and extended four feet and four inches farther north, and had, since the memory of the oldest inhabitant, always had a door opening into that part of the house from the outside, and until several years after the defendant took possession, a porch in front of and over it.

The plaintiff claimed, and his evidence tended to show, that there had been for many years before he purchased, a fence extending from the westerly side of the street to a point a few inches north of the northerly projection made by the ell part of the defendant's house at the old porch, and that this fence had been regarded by the occupants of the plaintiff's and defendant's land, as on the true line between them, and that it was on a line four feet northerly from the north-east corner of the main part of the defendant's dwelling-house, and that at the east end thereof, near the street, stood an old fence-post, which the defendant conceded he had always regarded as being on the true line between the two lots. The plaintiff claimed that this line should be extended westerly, on the south side of an appletree stub,

84

which he claimed was always regarded by his grantors as on their land, to a point west of the land in controversy, to the northeast corner of a tract of land conveyed to John B. Simonds by Elijah B. Wales, August 6, 1850 ; and claimed that this northeast corner was on the true line between the lots in controversy, and that a line beginning at said old post, and extending east, 69 degrees west, would run four feet north of the northeast corner of the upright part of said house, and south of said appletree stub, and to the northeast corner of said lot conveyed by Wales to Simonds, and that said Wales so regarded it when he gave said deed, he having by purchase acquired title to a portion of the land conveyed to Alanson Stone by John L. Dickerman, May 11, 1848, the same being a part of the original Hotchkiss property, and now owned by the defendant.　　Said Wales was produced as a witness by the plaintiff, but on his cross-examination testified that he did not know where the line then was, or now is, and admitted that he moved the barn which is now standing on a part of the premises purchased by him of Stone, and that he intended to locate the barn on his own land, and had no reason to suppose he did not so locate it, and testified that since he so located said barn, the northwest corner thereof had bulged out over what the plaintiff claimed to be the line.　　Plaintiff's evidence also tended to show, that on the line as he claimed it, at the point mentioned in the deed from Wales to Simonds, and extending a few feet easterly, there were traces of an old wall, which the plaintiff claimed were upon the boundary between the lots.　　This line thus extended westerly from a point four feet northerly from the northeast corner of the upright part of the defendant's dwelling-house, brought a new barn erected by him in 1869, ten inches north of that line at the easterly end of the barn, and between eleven and twelve inches at the westerly end thereof, and to this extent the defendant's barn, as claimed by the plaintiff, encroached upon his land. There was no evidence tending to show that there had ever been any fence between the lands of the plaintiff and defendant, west of the point where the fence ended at the old porch.　　The evidence on both sides concurred in showing, that until J. H. & W. H. Esterbrook erected their new house in 1855, there was an open

space or drive-way, extending from the street, past and near the south end of said red house, and into the garden west of and belonging thereto ; that said drive-way was bounded on the south by said old fence, as far as the same extended westerly from the street. This drive-way was described by the witnesses as being in width from fifteen to twenty feet, with a bar-way across the easterly end, about in a line with the front side of the old red house. There was no other fence between the possessions of the plaintiff and the defendant, known to any witness, except the one running from the street to the porch.

The evidence on the part of the plaintiff as to the manner that the space or drive-way between the buildings on their respective lots, had been used, and the evidence by parol as to the true or the possessory line between the plaintiff and the defendant, was substantially as follows :

*William H. Esterbrook :* " I owned the Davis house with my brother ; when he died it was set off to me ; David Ball conveyed to us ; when we bought, there was on old story and a half red house standing on it—one of the oldest houses in town—it stood up and down the street; we took down the old house and built new in 1854 or 1855 ; the new house stands further south than the old one ; I built one length of picket fence next to the picket fence by the road, a number of years—4 or 5—after I built the house : had been a fence there before ; was an old board fence ; we concluded that we didn't know where the line was, and put the fence on what we supposed was our land, thickness of post north of old fence ; was a board fence west, out to porch on kitchen door ; it seems to me that fence run up to an angle by Judge's door ; I should say the picket fence was about on a line with the old fence, was a post that stood by the porch, that the fence was nailed to : the old fence leaned over to the north—that post leaned over—might have been a space 18 inches at top and 10 inches at bottom between porch and post; was originally a drive-way between houses, on our land ; was north side of fence ; was used for accommodation of old red house ; drive-way was not used for accommodation of Judge's place ; it led from street into what is now Davis's garden ; wood was drawn in that way ; the wood-shed was on the south end next to Judge's old shed ; was made by spiking on a slit-work to Judge's shed, and then laying on boards, sloping to the north ; this shed remained there till we moved it when new house was built ; Isaac Hall owned Judge's

place at that time ; Hall never objected to this wood-shed ; never heard Judge object ; always occupied garden clear up to Judge's buildings ; Judge never asserted any claim north of fence or buildings ; I recollect old appletree ; was a space between appletree and Judge's old shed, 4 or 5 inches, should think ; a small child might possibly squeeze through ; never heard Judge assert any claim or right to land north of his line of sheds ; I have known the premises since a boy ; Judge's sheds had stood there some time. *Cross-examination.* Am 59 years old ; always lived in Brattleboro ; cannot remember when Judge's sheds were not there; I never lived on or near the premises ; I never knew where the line was between the premises ; I was ignorant when I sold, of where the old line was ; front of red house was as far front as Judge's house ; was a pair of bars that went across drive-way on a line with front of red house ; I cannot remember when this space was all open ; I paid no attention to it till we bought ; when we bought Ball property, Judge had a front fence ; I think his front fence was further back than where I put mine ; was a porch over front door to the ell of Judge's house ; when we bought it, was no fence running west beyond corner of ell towards appletree ; near the ground the appletree was 4 or 5 inches from Judge's buildings ; I am sure there was a space between ; our tenants used to use the apples of this tree ; I never told Bulkley that the tree was on the line ; I always supposed the old shed was built just so eaves dropped on Judge's land ; the fence was kept up and this drive-way was not a common one ; I don't know that the fence does not stand now where it did when I sold it ; think it stands where it used to."

*William Conant.* " Am 68 years old ; moved to Brattleboro in 1827 ; when I lived on premises of Davis, it was a long red house ; was one of the oldest in Brattleboro ; I moved into red house in 1835 ; I lived there 19 years almost ; red house and ell to yellow house, were 18 feet apart, might be ; was a drive-way on premises I lived on ; always supposed it belonged to my premises ; no one else drove in there unless permitted ; was a bar-way across drive-way nearly on a line of front of red house ; was a fence south of the drive-way, running from the street up to the porch of the yellow house ; the fence when I first went there, was nearly upright ; a grown person couldn't well get through between the fence and porch ; the last years I lived there, the post got bent over, and small persons used to go through ; don't know as I ever tried to go through ; there was a porch or stoop over the door to the ell part ; don't think the stoop projected further north than the thickness of a board ; when I first went there,

Rockey lived in the yellow house; a good many others lived there; Stone and Wales and a Foster lived there after Rockey; none of the occupants of the yellow house used this drive-way while I lived there; don't know why they should; there was no opening to it from the south; I know about the wood-shed; I put it up myself; I took joists and spiked on to the shed of the yellow house, even with the eaves of the shed; it was a board roof: sloped to the north; Rockey lived there then; he made no objection; I put up a small barn just west of the appletree; I put it up just as I did the wood-shed; when Wales moved the barn off, it left the south side of my barn all open; the fence was not a very old fence when I moved there, but was when I came away; I remember the appletree west of the shed I built; there was a space between the appletree and Rockey's shed; 1½ feet from the ground, was a space of six inches; it was supposed that the barn which Wales moved, stood right on the line; it stood on a straight line with the sheds when I lived there; Wales afterwards moved the barn; he turned it round; they never used our land only when they turned the barn round; might have stepped on my land then; I knew William Pulsipher, a former owner; Pulsipher and I were out in the garden one day; Pulsipher said when they built that ell, they crowded on him, and the water dripped on him, but he should make no trouble about it; Pulsipher was an old man, and is dead. *Cross-examination.* Mr. Pulsipher lived in Winchester, N. H.; the ell was not built at the same time the upright was; the ell-part did not look like an old building; upright part was well painted; I never owned the Ball property, I was a tenant; when I put up my shed, I took away an old one; a Mr. Hildreth used to use it to keep his cow in; it was old and worn out; this old shed was not quite so high as the one I built; when I put my barn up, I was a tenant of Mr. Ball's; at that time the sheds and barn on Judge's premises, and fence west between the barn and sheds, were on a straight line; the appletree began to decay after I went there; there never was a fence running up against the tree; my barn was west of the tree and my shed east of it; when I lived there Fisher's house was not built; Simonds built his house while I lived there; never knew them to shingle the ell part while I lived there; might have painted it; don't remember; it couldn't have been painted but once while I lived there; I don't remember anything about a hog-pen and privy there on Judge's premises, until after the barn was turned round."

*Elijah B. Wales.* "Lived in Brattleboro 25 years; have known this property since then; boarded with Alanson Stone one

year; then hired and lived in ell part and north room of upright part of yellow house 1½ years while Stone owned the premises; the red house was some 15 feet from the ell, and inside of 20 feet from the upright part of the yellow house; I remember the driveway; used to be a bar-way across it, even with the front of the red house; was a fence south of it between the premises, running from street to porch; the post at the porch was pitched over; the bottom was 6 or 8 inches from the porch; I did not use the driveway while I lived there, nor none of the families in the yellow house; I never occupied the land north of where the buildings stood; I recollect the appletree; 24 years ago I used to pass between the shed and tree to a hen-coop I had there; I am 44 years old; I owned the lot where Judge's west house now is, and the Esterbrook and Simonds tract; Henry Clark made the surveys through from Root lane to the Barnes lot; begun at Root lane, run northerly 47½ feet, and put down a stone, thence 47½ feet more, to the Ball line; used to be a bank wall and old board fence top, east of this point between Ball lot and my land; it stood there all the time I had known it; we put down a stone for a corner at the north-east corner of the lot sold to Simonds; was a stake put down there by Clark when he surveyed it; when I bought land of Stone, we put down corners, and they are there now; I moved the barn twice; moved it on to the line; it is squashed out now, the barn and wall is, all the way; the bottom of the north-west corner post of the barn, is out of plumb four to six inches; was plumb when I put it there. *Cross-examination.* George Esterbrook and Henry Clark were present and saw corner established on land I sold him; David Ball lived in Winchester, N. H.; I never examined the town records to ascertain where the line was; Mr. Clark took the deeds and run this land out which I sold; I didn't think much of a foot of land then; I moved the barn in 8 or 9 months after I bought; it stood there part of a day, and I turned it around again; it stood on land I bought of Stone; stood as far north as I bought; bottom wall was on line, as we supposed; I didn't understand I had a right to go round and repair it on the north side; the east end was on a line with the old wall; I built no hog-pen on my property; the privy used to stand on south side of sheds; Stone moved privy to within 5 inches of the line; hog-pen was next west of the privy; used to clean out privy from hog-pen; didn't go round on north side to do it; privy seat was on west side next to hog-pen; hog-pen was south of barn, and stood even with shed; it did not project northerly beyond line of sheds; those apples were an eating apple; never claimed them."

*Alanson Stone.* " I lived in yellow house from May, 1848, to

May, 1852; I sold off west part of lot to Wales; used to be a drive-way on the red house lot; it led into Conant's back yard; Conant used to use it; I never used it, nor did any of the occupants of the yellow house; was a fence that run up from front yard to porch; porch was over the kitchen door; might have been a space of 6 or 8 inches between porch and fence; we took our wood into yard south of yellow house; this porch extended the thickness of a board north of ell part; none of the occupants of yellow house, occupied or claimed a right north of the buildings, that I know of; I recollect when picket fence was built; the old post was over northeast corner; the old fence was on a straight line west from old post; I remember appletree; at the ground was one root that ran under foundation wall; as it run up it was 6 inches or one foot from sheds; Charles Conant used to have a hen-coop in there; boys 9 or 10 years old or younger, could go between tree and shed; wood-shed put up by Conant was there when I bought and sold; the appletree has been cut away on south side; Judge's new barn stands north of the line of the old shed that stood there; the wood-shed Conant built was attached to old shed; the barn Conant built was attached to barn on my premises; I claimed no right to appletree. *Cross-examination.* I didn't suppose I owned appletree; the buildings on Ball lot were very old; I had no occasion to go north side to make repairs; I should have asked permission to go on; I supposed if my line ever went any further, I had lost it by possession; have been in Brattleboro 38 or 39 years; the porch was put up with slit-work and boarded up and down; don't know that I ever used the apples of that tree.

*John B. Simonds.* "I purchased strip of land of Maj. Wales; was a corner fixed; stake drove down; Clark surveyed it and put down stake; I sold to W. H. Esterbrook a little strip off of north—a heater-piece like; east end was two feet wide, and west end run nearly to a point. *Cross-examination.* I knew nothing where the line was; was an old broken down rotten fence along there; fence run down easterly from my corner; Frank lived in the Brown house; Frank's east line and Judge's west line were same; from this line was a fence run east between Ball and Rockey property.

*Lafayette L. Davis.* "I am plaintiff and 36 years old; purchased in 1867; always lived in Brattleboro, except about a year and a half; have always known red house and yellow house property; red house and Judge house not over 20 feet apart; used to play with Conant's children; the drive-way was used by occupants of Ball property alone; was a fence south of drive-

way; I remember the porch over the kitchen door; it projected north no farther than the kitchen; old fence was from 8 to 10 inches from porch; I used to go through there; post was leaning over north; remember fence-post towards street; the jury saw it and found old pieces; the stake Hines and I put down, was a little north of old post found; that old post was part of old fence since I can remember; the post where they dug yesterday was east end of old fence; old fence was attached to end of picket fence; I ran new picket fence a little north of old line; the old fence leaned north towards my house; when I built new fence, I brought it north to match my picket fence; I built it 4 feet, 1 inch northerly of N. E. corner of yellow house; it is crowded over now, and is 4 feet, 4 inches; fence at corner of ell is 13 inches; since I bought property, Judge has lived in yellow house; Judge never claimed any rights north of his sheds; the new barn was built in summer or fall of 1869; it projects further north than his old barn did; his eaves drop some 20 inches over the line; used to be quite a space between appletree and old shed; children could get through; no one ever asserted any claim to the appletree since I lived there; appletree is on my land; I was present when Hines made his survey; he ran 47½ feet from G. W. Easterbrook's corner; found at terminus a stake and stones; we placed a stake there, and since then I have had Clark and Hines there, and we put down an iron pin. *Cross-examination.* I said nothing to Judge when he was building foundation wall for new barn; I spoke to his workman, Mr. Squires; told him he was getting over the line; Judge knew that the line was not there; I employed Hines to examine books and records before making his survey; we began at Esterbrook's corner and run 47½ feet north, because that was the only point we could find to start from; then started from the post conceded by Judge, and run four feet north of house; I moved the old fence and put up a new one; the fence was put an inch on me; I built the fence in 1867; it might show from post holes on top of the ground, that I took some of Judge's land, but the fence was badly tipped towards me."

*George H. Clark.* "I run a line for Judge just before Hines and I were there together; commenced 4 feet northerly of N. E. corner of the yellow house; I sighted through to a target Judge held up, which he said was 6 inches north of the Wales barn; I followed his directions."

*George A. Hines.* "I once run a line for Judge; by his direction I started at the old fence-post, and run to a point 6 inches north of the Wales barn; this line, as extended from the old fence

post westward to strike the point 6 inches north of the Wales barn, would run 4 feet, 2 or 3 inches northerly of the N. E. corner of Judge's house."

The plaintiff gave no evidence tending to show adverse possession by his grantors, or acquiescence in any claim or line by the defendant and his grantors, other than is above detailed.

The defendant's evidence tended to show that he and his grantors had always, when occasion required, used the space or driveway between the buildings, for a passage-way for repairing the buildings, and for cleaning a privy which discharged near the north line of the defendant's buildings ; his evidence also tended to show, that no title had been gained or lost by either party by adverse possession, and that neither party had ever acquiesced in any other line than the true line, wherever that might be ; that the new barn erected by him in 1869, was in a line with the buildings before standing, and was erected upon his own land and exactly where a portion of the old shed stood.

The defendant requested the court to charge the jury :

1.  " That the deed from Joseph Clark to James Elliot, July 1, 1801, operated to convey all the land enclosed by the boundaries specified in that deed ; therefore, James Elliot's north line is to be found at a point 1½ rods north of the north-east corner of the defendant's house.

2.  " That the deed from James Elliot to Noah Sabin, May 26, 1803, operated to convey the same lands which Clark conveyed to him in 1801; that the phrase, ' beginning about four feet north,' &c., in connection with the remainder of the description of the premises, in the absence of evidence that Elliot did not intend to convey all he owned, or that he afterwards asserted a claim to any lands south of a point 1½ rods north, &c., does not operate to restrict the boundaries of the land conveyed, or to remove the north-east corner any further south.

3.  " That the legal effect and construction of Clark's deed to Pratt, May 20, 1804, was, to convey a tract of land beginning at a point one and one half rods north of the north-east corner of the house, thence running west 24 degrees 50 minutes south, 10 rods and 23 links, as the compass then indicated ; that the plaintiff now owns only the land which Clark conveyed to Pratt ; therefore, the plaintiff has shown no paper title to the land in controversy.

85

4.   " That the case shows that the defendant has title by deed to the land in controversy ; therefore the defendant is entitled to recover, unless the jury are satisfied that he has lost the land by reason of the plaintiff and his grantors having acquired title to the same by adverse possession.

5.   " That there is no evidence in the case tending to show that the defendant has thus lost his right to the land on which his barn stands.

6.   " That the testimony of William Conant does not show any such adverse possession of the land on which his barn stands, as would deprive the defendant of his right to erect it there.

7.   " That in order for the defendant to be deprived of his right to go upon the lands north of his buildings to repair or rebuild, or to deprive or oust him from his land to a reasonable distance north from the foundations of his buildings, the plaintiff or his grantors must have enclosed the land, or in some other way so asserted a claim thereto, that the defendant or his grantors might know, or have good reason to know, that the plaintiff or his grantors were claiming a right to the land adverse to him."

The court declined to charge as requested, but as to the question of title by deed, told the jury in substance, that the true line between the plaintiff and the defendant, was to be found at a point four feet northerly of the north-east corner of the defendant's dwelling-house, and by that, was meant the north-east corner of the main part of the house.   Upon the subject of adverse possession, the court declined to charge as requested, but charged, in substance, that if the jury found that the plaintiff and his grantors had, for a period of more than fifteen years, had the open, notorious, and exclusive possession of the land upon which the defendant's barn, or any part of it, stood, claiming title adversely to the defendant, that he was entitled to recover as much thereof as he had thus proved his possession of, just the same as if he had had a deed of it.   The court further charged the jury upon the subject of acquiescence, as follows :

" There is another mode by which the line may be established. If the line has been regarded by the parties on both sides for the period of fifteen years, as the true line, even though it may vary from the line established by the old deeds, it would become the true line by acquiescence.   A line may be established by acquiescence of the parties, that is not the true line of the survey.

Where adjoining owners treat a line as the dividing line, and they both occupy with reference to it as the true line, when that occurs for a period of fifteen years, that becomes the true line, as much so as if it was a line established by an original survey, and which the original survey itself evidences. You have heard the evidence bearing upon this aspect of the case. It is how the parties have lived side by side, and occupied side by side, by their fences, by their buildings, by their uses of these two contiguous house lots. It will be for you to say, then, whether the line as the plaintiff claims it, where this barn is located, had become established between the parties before the putting of that barn there, by acquiescence, by the actual concurrence of the parties that the line between them was where the plaintiff claims it. If so, then so far as the right of the plaintiff in this case is concerned, it is the same as if established by an old original survey, and where it was located by that old original survey."

The jury returned a verdict for the plaintiff, and in answer to a question by the court, responded that, " the jury find the line to be as claimed by the plaintiff, and established by acquiescence." The defendant excepted to all the charge above given, and to the omission of the court to charge as requested.

*C. N. Davenport*, for the defendant.

There was manifest error in the charge as given, and the omission to charge as requested, upon the subject of title by deed. The defendant was entitled to have the jury instructed, that Clark's deed to Elliot, operated to convey all the land enclosed by the boundaries specified in that deed, and that the true north line of Elliot's land, was to be found by starting at a point 1½ rods north of the north-east corner of the defendant's house.

The court erred in failing to comply with the second request. The legal effect of the deed from Elliot to Sabin, is to convey the same lands which Clark conveyed to him. There was no evidence tending to show that Elliot ever after asserted claim to any lands south of the northern boundary in the deed from Clark to him; or that he intended to convey any less. On the contrary, I insist that the intent to convey the whole, is clearly manifest from the deed itself. It describes the land in the occupation of Calvin Bannister, bounded as follows: " Beginning about four feet north

of the north-east corner of the house now occupied by said Bannister, thence running southerly, bounded by the west side of the highway, to the foot of a ledge of rocks, and extending so far west, and thence north and east to the place of beginning, as to include one acre of land, containing one acre of land." It is apparent that Elliot intended to convey Sabin the same acre of land he had bought of Clark. The description is precisely like that in Clark's deed, except the starting point. It is a fundamental rule in the construction of deeds, that the intent of the parties, as manifested by the entire instrument, controls the interpretation. So, if there is an apparent repugnancy in the description, that portion is to be preserved which best subserves the prevailing intention of the grantor. 2 Washb. Real Prop. 628; *State* v. *Trask*, 6 Vt. 355; *Hull* v. *Fuller*, 7 Vt. 100; *Gates* v. *Lewis*, 7 Vt. 511; *Exrs. of Stevens* v. *Hollister*, 18 Vt. 294; *Pierce* v. *Brown*, 24 Vt. 165; *Hibbard* v. *Hurlburt*, 10 Vt. 173; *Park* v. *Pratt et al.* 38 Vt. 551; *Flagg, admr.* v. *Eames et al.* 40 Vt. 16; *Bundy* v. *Morgan*, 45 Vt. 46; *Worthington* v. *Hyler*, 4 Mass. 196; *Allen* v. *Holton*, 20 Pick. 458.

The defendant was entitled to the instruction prayed for in his third request. If we are right in the positions above urged, then it necessarily follows that the " north-east corner of a tract of land owned by Noah Sabin," is to be found at the point designated in Clark's deed to Elliot, that is, 1½ rods north of the north-east corner of the house. Clark had, less than three years before, conveyed the adjacent tract to Elliot. He found the starting point 1½ rods due north from the north-east corner of the house. When he gave the last deed, nothing can be more natural than that he had in mind the same starting point. *Park* v. *Pratt, supra; Gates* v. *Lewis, supra.*

The charge as given upon the question of title by deed, is erroneous in respect to its failure to answer our three first requests, and especially in telling the jury that " the true line between the plaintiff and the defendant, was to be found at a point four feet northerly of the north-east corner of the defendant's dwelling-house, and that by that, was meant the north-east corner of the main part of the house." The assumption that " about four feet," means

*exactly* four feet, was error.  I submit that, " about four feet," means, near or in the vicinity of four feet.  The court told the jury that " about four feet north," meant "*four feet northerly.*"  I submit that *north* means *due north.*  There is no authority for the construction of the court below.  On the contrary, if a deed calls for a line running " northerly," that, in the absence of any controlling monuments, is taken as meaning a line running due north.  *Brandt* v. *Ogden*, 1 Johns. 156 ; 2 Washb. Real Prop. 675.  The court trenched upon the province of the jury, when they held as matter of law, that the reference in the deed to the north-east corner, meant the north-east corner of the main part of the house.  The defendant·had a right to go to the jury with the question of which of the corners was meant by the parties in Elliot's deed to Sabin, and even parol evidence would be admissible to show which corner was intended.  2 Washb. Real Prop. 682 ; *Waterman* v. *Johnson*, 13 Pick. 261 ; *Claremont* v. *Carleton*, 2 N. H. 369 ; *Stevens* v. *Hollister, supra ; Morse* v. *Weymouth*, 28 Vt. 824.

Upon the subject of adverse possession, the court should have charged as requested in the 4th, 5th, 6th, and 7th requests.  The charge as given, though substantially correct as an abstract legal proposition, was not fairly applicable to the facts in the case.  It is true that the jury failed to find that the plaintiff had acquired and defendant lost this land by adverse possession ; yet, such a charge, in connection with the omission to tell the jury what constitutes an " open, notorious, and exclusive possession, claiming title adversely," &c., would be likely to mislead the jury when they came to consider the subject of acquiescence.

The evidence in this case on both sides, " showed that before the recollection of any witness produced, the old yellow house now occupied by the defendant was standing upon the premises, and in a line therewith and extending westerly, there was a long shed and other outbuildings.  No witness upon either side professed any personal knowledge as to where the line mentioned in the old deeds was located.  Nor was it claimed on either side that any bound or monument mentioned in the deeds, could now be located, except the north-east corner of the defendant's house."  In

view of this evidence, in connection with the fact that up to the time the old red house was torn down by Esterbrook in 1855, the land between the houses had always remained open and unenclosed, save as the buildings enclosed it, and had been used mainly for a drive-way, the court should have complied with the seventh request. *Mitchell* v. *Walker*, 2 Aik. 266 ; *Plimpton* v. *Converse*, 44 Vt. 158 ; *Sargent* v. *Ballard*, 9 Pick. 25 ; *Jackson* v. *Sharp*, 9 Johns. 163 ; *Medford* v. *Pratt*, 4 Pick. 227 ; *Gloucester* v. *Beach*, 2 Pick. 60, note.

The charge upon the subject of acquiescence, as applicable to the facts in this case, is erroneous.   A boundary or line by acquiescence, is one originally established by agreement of the adjoining owners, and subsequently acquiesced in as the true one for a period of fifteen years or more.   *White* v. *Everest*, 1 Vt. 181 ; *Stevens, admr.* v. *Griffith*, 3 Vt. 455 ; *Beecher* v. *Parmalee*, 9 Vt. 352 ; *Burton* v. *Lazell*, 16 Vt. 161 ; *Ackley* v. *Buck*, 18 Vt. 395 ; *Brown* v. *Edson et al.* 23 Vt. 435 ; *Clark* v. *Tabor*, 28 Vt. 222 ; *Jackson* v. *Van Corlear*, 11 Johns. 123.

*Clark & Haskins* and *Field & Tyler*, for the plaintiff.

The defendant was not entitled to have the jury instructed in accordance with his first, second, or third request.   All the evidence as detailed in the bill of exceptions, the court below had a right to take into consideration, in connection with the record evidence, in construing the old deeds referred to in the defendant's request, and also as to whether the plaintiff had shown a *paper* title to the land in controversy.   Courts in charging juries are expected to exercise a certain amount of reason and common sense in the light of all the evidence before them ;   and conceding that the deed from Joseph Clark to James Elliot, operated to convey all the land enclosed by the boundaries specified in that deed, it does not follow that James Elliot's north line is to be found at a point 1½ rods north of the north-east corner of defendant's house as it *now* stands, but rather as it *then* stood ; or that the point of beginning, and not the north line, was to be found 1½ rods north of the house *then* standing thereon.   That the true line between the premises of the plaintiff and defendant was originally and is now

a straight line through the whole length of the original grantor's possession, there can be no question. And that the old post, the old appletree, and the remnants of the old wall beyond, were ancient, well-defined, well-recognized monuments standing upon and near the line of their premises, and clearly defining the extent of their respective possessions, there is as little question. We understand it to be a familiar principle of law, that in giving construction to deeds, courses, distances, and points of compass, are always to be controlled by monuments, when ascertained and known. *Gates* v. *Lewis*, 7 Vt. 511; *Park* v. *Pratt et al.* 38 Vt. 545; *Bundy* v. *Morgan*, 45 Vt. 46; 3 Washb. Real. Prop. 348, *et seq.*

Title to land may be acquired by fifteen years adverse possession, as perfect for all purposes as though acquired by deed. This principle of law is so familiar and so well understood by every one, that no authority or reference to judicial decisions will be required in support of it. The point then is, whether the court below erred in its refusal to charge upon the question of adverse possession as requested; and, also, whether there is error in the charge given, as detailed in the bill of exceptions. Assuming that the line as originally established between the premises of the plaintiff and defendant, was not where the plaintiff now claims it to be, there certainly was abundance of evidence tending to show that the plaintiff had acquired title to the land in controversy, by adverse possession. We insist that the charge in this respect, was in strict accord with what is now the recognized and well-established rule of law. 3 Washb. Real Prop. 134, *et seq.* *Arbuckle* v. *Ward*, 29 Vt. 43; *Tracy* v. *Atherton et al.* 36 Vt. 503; *Jakeway* v. *Barrett*, 38 Vt. 316; *Hughes* v. *Graves*, 39 Vt. 359; *Hodges* v. *Eddy*, 41 Vt. 485; *Kimball* v. *Ladd*, 42 Vt. 747. Again, the defendant should not be permitted to take anything by his exceptions thus far, should this court be of the opinion that there was error, for the defendant has not been prejudiced thereby, the jury having failed to find for the plaintiff upon either the issue made as to the paper title, or title by adverse enjoyment, but did find for the plaintiff upon another distinct and independent issue.

The principal question would seem to be as to the charge of the court upon the subject of title by acquiescence. We have been unable thus far to find any error in the charge of the court upon this branch of the case. The principle of law is well settled, that successive occupations may be added, to make out the fifteen years. *Shepherd et al.* v. *Hayes*, 16 Vt. 486 ; *Brown* v. *Edson et al.* 23 Vt. 435 ; *Holton* v. *Whitney*, 30 Vt. 405 ; 3 Kent Com. 444 ; 2 Washb. Real Prop. 305. It is a well settled principle of law, that a line between adjoining proprietors of lands, acquiesced in as the line of division between their respective premises for a period of fifteen years, becomes thereby the true line, and cannot be disturbed. *White* v. *Everest*, 1 Vt. 181 ; *Beecher* v. *Parmalee*, 9 Vt. 352 ; *Burton* v. *Lazell et al.* 16 Vt. 158 ; *Brown* v. *Edson, supra ; Buck et al.* v. *Squiers*, 23 Vt. 498 ; *Holton* v. *Whitney, supra ; Clark* v. *Tabor*, 28 Vt. 222 ; *Hodges* v. *Eddy, supra.* The jury must have found that the line as claimed by plaintiff, became the division line between their respective premises by the acquiescence of the owners thereof for a period of more than fifteen years prior to the time when either the plaintiff or defendant became owners. The evidence as detailed in the bill of exceptions would most certainly justify such a finding. If, however, the possession of the plaintiff and his grantors to the lands in controversy, had not been continued and acquiesced in for a sufficient length of time, so as to give plaintiff's grantor title by virtue of such acquiescence before defendant purchased ; still, if it had commenced, the case fails to show anything done by the defendant, that would amount to an interruption of it, so as to prevent the claim of plaintiff and his grantors ripening into a title after the lapse of fifteen years from the commencement thereof. *Johns* v. *Stevens et al.* 3 Vt. 308 ; *Whitney* v. *French*, 25 Vt. 663 ; *Tracy* v. *Atherton et al.* 36 Vt. 503. If the defendant's grantors acquiesced in the line as now claimed by the plaintiff, as being the true line, for the period of fifteen years, it does not now lie in the mouth of the plaintiff to set up another line as being the true line. He is estopped by the long acquiescence of his grantors.

The opinion of the court was delivered by

REDFIELD, J. The deed from Joseph Clark to James Elliott, July 1st, 1801, describes the land conveyed as one acre, " beginning one and one half rods north of the north-east corner of the house now occupied by said Smead ; thence running southerly, bounded by the west side of the highway," &c. The description is the same in the deed of said Elliott to Noah Sabin 3d, May 26, 1803, with a different description of the starting point, viz, " Beginning about four feet north of the N. E. corner of the house now occupied by said Banister ; thence running southerly," &c. When Joseph Clark, May 20, 1804, conveyed to Levi Pratt the adjoining land, now owned by the plaintiff, he describes it thus : " Beginning on the west side of the road * * at the N. E. corner of a tract of land owned by Noah Sabin," and then naming only courses and distances. No *line* is given from the starting point to the highway. And in the latter deed, the corner of both tracts is stated to be in the west line of the highway. If the respective proprietors had given no practical construction of their several deeds, by occupancy and acquiescence, there would be some difficulty in tracing the description upon the land. But the description in the deed of Elliott to Sabin concurring, in the main, with the fences and muniments which the respective owners have kept up for many years, dividing the estates, and acquiesced in and treated as the true line, should now put to rest all dispute as to the line. And, we think, the charge of the court, as to the legal effect in quieting titles to land by mutual acquiescence, was unexceptionable. The special verdict of the jury concludes the parties by the practical line established by occupancy and acquiescence ; and if there were error in the charge of the court (which we do not find), it would be cured by the special verdict of the jury. *Hodge* v. *Bennington*, 43 Vt. 450.

Judgment affirmed.